IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICHARD SHERMAN, individually and on behalf of similarly-situated persons, | )<br>)<br>) |
| Plaintiff, | ) 11 C 5857<br>) |
| v. | ) Judge Virginia M. Kendall<br>) |
| AT&T INC., a Delaware corporation; AT&T TELEHOLDINGS, INC. d/b/a AT&T Midwest, a Delaware corporation; and SBC INTERNET SERVICES, INC. d/b/a AT&T Internet Services, a California corporation, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Richard Sherman ("Sherman") filed suit against Defendants AT&T Inc., a Delaware corporation; AT&T Teleholdings Inc. d/b/a AT&T Midwest, a Delaware corporation; and SBC Internet Services Inc. d/b/a AT&T Internet Services, a California corporation (collectively, "AT&T").[1] The suit alleges breach of contract, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ICLS 505/1, *et seq*, and alternatively, unjust enrichment. AT&T moves to compel arbitration of Sherman's claims and seeks a stay of proceedings in this Court pending the outcome of such arbitration. For the reasons set forth below, AT&T's Motion to Compel Arbitration is granted, and the current judicial proceedings are stayed pending the outcome of arbitration.

---

[1] AT&T Inc. was voluntarily dismissed without prejudice for lack of personal jurisdiction. (Doc. 20).

**BACKGROUND**

Sherman resides in Illinois and called AT&T on February 25, 2011, to speak with an AT&T salesperson to order residential internet service. (Doc. 1-1, Complaint ¶16). The internet plan was subject to AT&T's Internet and Conditions ("IT&C") presented on its website, which lists the pricing plans and states that "[o]ther conditions and restrictions apply." (Complaint, Ex. D). Sherman activated his internet service on March 3, 2011. (Doc. 15, Ex. 3, p. 5). To activate his internet service, he was required to complete an online registration process, during which he was asked to check a box labeled "I have read and agree to the AT&T Terms of Service, Acceptable Use Policy, AT&T and Yahoo Privacy Policies, Wi-Fi Terms of Service." On that same screen, "AT&T Terms of Service" linked to the AT&T Terms of Service ("Terms"). (Doc. 15, Ex. 3, p. 7). If Sherman did not check the box, he would not have been able to proceed with the activation process and never would have received service. (Doc. 15, Ex. 3, p. 2-3). The Terms include an arbitration provision that requires its parties to "arbitrate all disputes and claims" between them "based in whole or in part upon" the internet service, on an individual basis. (Doc. 15, Ex. 3, p. 21).

In May 2011, AT&T revised its Terms, and pursuant to the change-in-terms-provision, provided notice to its customers by sending them an email containing information about the revision, a link to the full text of the Terms and a reminder that "[b]y continuing to use the Service, you are agreeing" to the Terms. (Doc. 15, Ex. 3, p. 31-32). The revision changed the dispute resolution provision only by changing the mailing address to where customers could send notices of their disputes. (Doc. 15, Ex. 3, p. 50). On July 26, 2011, Sherman filed suit individually and while seeking to represent a class of similarly-situated persons, alleging that

AT&T systematically overcharged consumers for residential internet service by advertising promotional plans and yet billing customers at standard rates. (Doc. 1-1).

**STANDARD OF REVIEW**

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, provides that a written arbitration agreement contained within a commercial contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." The FAA evidences a strong federal policy favoring arbitration and "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985). Arbitration may be compelled by the Court pursuant to the FAA whenever there is a written arbitration agreement, a dispute falling with the agreement's scope, and a refusal by one of the parties to submit to arbitration. *See Zurich American Ins. Co. v. Watts Industries*, Inc., 417 F.3d 682, 687 (7th Cir. 2005). Recently, the Supreme Court reemphasized that Section 2 promotes arbitration so as to "facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1741 (2011). This "liberal federal policy favoring arbitration agreements" applies "notwithstanding any state substantive or procedural policies to the contrary." *Id.* at 1749 (quotations omitted).

**DISCUSSION**

The contract for internet service at issue here falls within the FAA because its arbitration agreement is "written" and in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2; *see Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1054 (10th Cir. 2008) ("the Internet is generally an instrumentality of interstate commerce"). Furthermore, the arbitration provision explicitly states that the contract "evidences

3

a transaction in interstate commerce, and thus the [FAA] governs the interpretation and enforcement of this provision." (Doc. 15, Ex. 3, p. 22). This Court may compel Sherman to arbitrate his dispute with AT&T and stay the current judicial proceedings, because there is a written arbitration agreement, their dispute falls with the agreement's scope, and Sherman refuses to submit to arbitration.

Nevertheless, Sherman argues that he never agreed to arbitrate his dispute because the contract he believes he formed when he ordered internet service is not subject to the Terms to which he agreed when he activated his service. Sherman additionally argues that even if the Terms are valid, they were not expressly incorporated by the IT&C and were unavailable at the time of contract formation, thereby rendering the Terms unconscionable under Illinois law. Finally, Sherman argues that the Terms lack mutuality and are therefore unenforceable under Illinois law.

### I. AT&T's Terms Govern the Parties' Contract

Sherman argues that he formed a contract with AT&T on February 25, 2011, when he spoke with an AT&T representative to order internet service, and that the representative made no mention of an arbitration requirement. However, AT&T is not required to have its sales representative read the arbitration provision aloud to potential customers in order for them to be bound by it. *See, e.g., James v. McDonald's Corp.*, 417 F.3d 672, 678 (7th Cir. 2005) ("To require McDonald's cashiers to recite to each and every customer the fourteen pages of the Official Rules, and then have each customer sign an agreement to be bound by the rules, would be unreasonable and unworkable."). Vendors may enclose the full legal terms within their products rather than reciting them prior to purchase, for practical purposes:

4

> If the staff at the other end of the phone for direct-sales operations . . . had to read the four-page statement of terms before taking the buyer's credit card number, the droning voice would anesthetize rather than enlighten potential buyers. Others would hang up in a rage over the waste of their time. And oral recitation would not avoid customers' assertions (whether true or feigned) that the clerk did not read term X to them, or that they did not remember or understand it. . . . Competent adults are bound by such agreements, read or unread.

*Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997). Consequently, Sherman may be bound by the arbitration provision even if the sales representative did not read him the provision when executing his order.

Sherman also argues that his conversation with the AT&T representative constitutes the meeting of the minds of himself and AT&T, and because the on-screen IT&C neither mention arbitration nor incorporate the Terms explicitly by reference, he never agreed to arbitrate. However, the brief IT&C explicitly state that "other conditions and restrictions apply" to the pricing plans listed on-screen. (Doc. 1-1, Ex. D). Furthermore, Sherman was not billed when he placed his order on February 25, 2011, but rather, when he activated his internet service on March 3, 2011. As part of that activation process, he actively assented to the full terms and conditions when he clicked "I have read and agree to the AT&T Terms of Service [.]" (Doc. 15, Ex. 3, p. 7). The Seventh Circuit has repeatedly upheld such a process of informing a customer of the full terms and conditions of his contract after his initial order. *See Hill*, *supra* (under Illinois law, computer-purchaser who ordered a computer by phone was bound by the arbitration provision of the purchase contract contained in the computer box because he had an opportunity to return the computer after reading it); s*ee Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002) (under Illinois law, telephone service-customer who received AT&T's mailed notice of new terms—including a new arbitration provision—accepted those terms by continuing to use his AT&T telephone service rather than rejecting the terms); *see also ProCD, Inc. v. Zeidenberg*,

5

86 F.3d 1447 (7th Cir. 1996) (terms inside a box of software bind consumers who use the software after having an opportunity to read the terms and to reject them by returning the product); *see also Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991) (a forum-selection clause that was included among three pages of terms attached to a cruise ship ticket was enforceable). Therefore, Sherman's assent when he activated his service constituted acceptance of the Terms, regardless of whether he believes he participated in a "meeting of the minds" when he placed his order with an AT&T sales representative.

Next, Sherman argues that because he has presented a genuine issue of material fact as to whether he had sufficient notice of the Terms when he placed his order, the Court should proceed to a trial on the validity of the Terms. "[S]ignif[ying] agreement by clicking on a box on the screen" is "common in Internet commerce." *Treiber & Straub, Inc. v. UPS*, 474 F.3d 379, 382 (7th Cir. 2007). This type of assent is called clickwrap, in which a webpage user manifests his assent to the terms of a contract by actively clicking an "accept" button in order to proceed. *See Van Tassell v. United Mktg. Group*, LLC, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011) (describing various means of demonstrating contractual mutual assent on the internet). The clickwrap process of checking a box next to hyperlinked terms generally provides adequate notice. *See Treiber & Straub*, 474 F.3d at 385 (finding a clickwrap process to have "provided adequate notice" to customers when it required clicking assent, the terms repeated the disclaimer of liability several times and referred to the pertinent parts of the contract that was also available on the business's website); *see also DeJohn v. The .TV Corp. Int'l*, 245 F. Supp.2d 913, 919 (N.D. Ill. 2003) (finding internet contract terms enforceable when a webpage user had opportunity to click on hyperlinked terms and "failure to read a contract is not a get out of jail free card"). Here, notice would have come from Sherman's checking a box labeled "I have read

and agree to the AT&T Terms of Service"" where "AT&T Terms of Service" linked to the Terms. (Doc. 15, Ex. 3, p. 7). Sherman does not deny and cannot deny that he actively clicked that he accepted the hyperlinked Terms, because he would have been unable to proceed with the activation process and would never have received his internet service without clicking his assent. The Terms contain clear and reasonable language, in capital letters, that the customer and AT&T agree to waive the right to a trial by jury and to participate in a class action, (Doc. 15, Ex. 3, p.22), and repeat that this binding arbitration agreement affects the customer's rights (p. 21), in capital letters (p. 24). Sherman has not raised a genuine issue of material fact that the Terms do not provide reasonable notice. Consequently, Sherman had adequate notice of the Terms, to which he assented at the time of his activation of internet service.

## II.     AT&T's Arbitration Provision is Not Unconscionable

Sherman next claims that even if the Terms are valid, they were unavailable at the time of contract formation, and neither bargained for nor expressly incorporated by the IT&C. Relying on factors identified in *Razor v. Hyundai Motor America*, Sherman argues that these aspects of AT&T's process make the Terms procedurally unconscionable under Illinois law. 222 Ill.2d 75 (Ill. 2006). Procedural unconscionability refers to "a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Id.* at 100. The facts already establish that Sherman had a full and fair opportunity to review the Terms prior to activating his service and before he had ever been billed for service. What's more, in May 2011, AT&T revised its Terms, and pursuant to its change-in-terms-provision (Doc. 15, Ex. 3, p. 9), provided notice to its customers by sending them an email containing information about the revision, a link to the full text of the Terms and a reminder that "[b]y continuing to use the

Service, you are agreeing" to the Terms. (Doc. 15, Ex. 3, ps. 31-32). The revision changed the dispute resolution provision only by changing the mailing address to where customers could send notices of their disputes. (Doc. 15, Ex. 3, p. 50). The revised Terms repeat thrice in bold capital letters on the front page that the customer should read the agreement carefully and that "paragraph 13 requires arbitration on an individual basis to resolve disputes, rather than jury trials or class actions." (Doc. 15, Ex. 3, p. 37). The Terms are not difficult to find, read or understand, and consequently AT&T's process is not procedurally unconscionable.

Further, it is irrelevant that the Terms were drawn up by AT&T without Sherman's input or bargaining, because even a "whole deal . . . offered on a take-it-or leave-it basis" does not constitute a contract of adhesion under Illinois law, since "few consumer contracts are negotiated one clause at a time." *Carbajal v. H&R Block Tax Servs.*, 372 F.3d 903, 906 (7th Cir. 2004). Finally, that the arbitration provision limits AT&T's class action liability does not diminish its enforceability. *See, e.g., Concepcion*, 131 S. Ct. at 1744 ("the FAA prohibits States from conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures"). The Court finds that Sherman agreed to a contract with a change-in-terms-provision and subject to other conditions, was presented readily-accessible Terms prior to activation, and was granted a full and fair opportunity to abort his activation process and later to review the revisions. *Compare Kinkel v. Cingular Wireless, LLC*, 223 Ill.2d 1 (2006) (contract was not procedurally unconscionable because plaintiff-purchaser had terms in her possession and could have read them; however, contract was substantively unconscionable because it failed to provide a cost-effective mechanism for individual remedies in either a judicial or an arbitral forum). Consequently, AT&T's arbitration provision is not procedurally unconscionable.

### III. AT&T's Arbitration Provision Does Not Lack Mutuality

Finally, Sherman argues that the Court should not enforce the arbitration provision because it only covers claims *against* AT&T and lacks mutuality under Illinois law. However, so long as Sherman received consideration for the arbitration agreement, Illinois courts will enforce AT&T's arbitration provision. *Bishop v. We Care Hair Dev. Corp.*, 738 N.E.2d 610, 622 (Ill. App. Ct. 2000) ("the proposition that an arbitration agreement is not mutually binding where one party reserves the option to raise and resolve the majority of disputes in a court rather than through arbitration . . . cannot be reconciled with Illinois law" because "mutuality of obligation is not essential if the requirement of consideration has been met"). Sherman does not dispute that he received consideration for the whole contract, but rather, that the arbitration agreement is an "independent contract" that requires independent consideration. Here, AT&T's Terms are not an "independent contract" because AT&T had offered Sherman—prior to his activation and billing—both internet service and advantageous arbitration terms, including AT&T's commitment to pay all arbitration filing, administration and arbitrator fees unless the claim is frivolous; and even if frivolous, so long as the claim is less than $10,000, Sherman's fee would be capped at $125. (Doc. 15, Ex. 3, p. 14). Thus, Sherman has received adequate consideration for AT&T's Terms, including its arbitration provision, as part of the broader agreement of the purchase order and IT&C's subject-to-change clause. *See Tortoriello v. Gerald Nissan of N. Aurora, Inc.*, 379 Ill. App. 3d 214, 238 (Ill. App. Ct. 2d Dist. 2008) ("where the promise to arbitrate is part of a clause within a larger contract" and is supported by consideration, "the arbitration clause does not suffer for lack of mutuality of obligation"); s*ee also Boomer*, 309 F.3d at 419 ("arbitration offers cost-saving benefits" that are "reflected in a lower cost of doing business that in competition are passed along to customers").

**CONCLUSION AND ORDER**

Sherman has failed to set forth facts to show that AT&T's arbitration provision is invalid, unconscionable or lacking mutuality. Consequently, AT&T's arbitration provision is enforceable, and the Court grants AT&T's Motion to Compel Arbitration. The current judicial proceedings are stayed pending the outcome of arbitration.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 26, 2012